

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-75,541

**CLIFTON WILLIAMS, Appellant**

**v.**

**THE STATE OF TEXAS**

**ON DIRECT APPEAL
CAUSE NO. 114-1505-06 FROM THE 114ᵀᴴ DISTRICT COURT
SMITH COUNTY**

HERVEY, J., delivered the opinion of the Court in which KELLER, P.J., MEYERS, WOMACK, KEASLER, HOLCOMB and COCHRAN, JJ., joined. WOMACK, J., filed a concurring opinion. PRICE and JOHNSON, JJ., concurred.

**O P I N I O N**

A jury convicted appellant of murdering a 93-year-old woman in her home during the course of committing or attempting to commit several felonies (including burglary, robbery and arson). Pursuant to the jury's answers to the special issues, including a special issue on whether appellant is mentally retarded, the trial court sentenced appellant to death. Appellant raises seven points of error on direct appeal. Deciding that these points have no merit, we affirm.

In point of error one, appellant challenges the sufficiency of the evidence to support the jury's finding that he is not mentally retarded. In *Atkins v. Virginia*, 536 U.S. 304, 321 (2002), the United States Supreme Court decided that it violates the United States Constitution for a state to execute a mentally retarded murderer. We have adopted the American Association on Mental Retardation (AAMR) definition of mental retardation for *Atkins* claims presented in Texas death-penalty cases. *See Ex parte Briseno*, 135 S.W.3d 1, 7-8 (Tex.Cr.App. 2004). The AAMR defines mental retardation as a disability characterized by: (1) "significantly subaverage" general intellectual functioning, which is usually evidenced by an IQ "of about 70" or below,[1] (2) accompanied by "related" limitations in adaptive functioning,[2] (3) the onset of which occurs prior to the age of 18. *See id.*;[3] *see also Ex parte Tennard*, 960 S.W.2d 57, 61 (Tex.Cr.App. 1997) (third part of AAMR definition requires a person to exhibit parts one and two of the AAMR definition during the developmental period). Some "other evidentiary factors which factfinders in the criminal trial context might also focus upon in weighing evidence as indicative of mental retardation" include:

> Did those who knew the person best during the developmental stage—his family,

---

[1]

*See Briseno*, 135 S.W.3d at 7 n.24.

[2]

*See Briseno*, 135 S.W.3d at 7 n.25 ("Impairments in adaptive behavior are defined as significant limitations in an individual's effectiveness in meeting the standards of maturation, learning, personal independence, and/or social responsibility that are expected for his or her age level and cultural group, as determined by clinical assessment and, usually, standardized scales.") (internal quotes omitted).

[3]

In *Briseno*, 135 S.W.3d at 7-8, we also adopted the definition of mental retardation contained in the Texas Health and Safety Code, which, similar to the AAMR definition, defines mental retardation as "significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period." *See* TEX. HEALTH & SAFETY CODE § 591.003(13).

friends, teachers, employers, authorities—think he was mentally retarded at that time, and, if so, act in accordance with that determination?

Has the person formulated plans and carried them through or is his conduct impulsive?

Does his conduct show leadership or does it show that he is led around by others?

Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?

Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?

Can the person hide facts or lie effectively in his own or others' interests?

Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

*See Briseno*, 135 S.W.3d at 8.

We have also decided that a defendant, presenting an *Atkins* mental retardation claim at trial, has the burden to prove by a preponderance of the evidence that he is mentally retarded. *See Gallo v. State*, 239 S.W.3d 757, 769-70 (Tex.Cr.App. 2007), *cert. denied*, 128 S.Ct. 2872 (2008). In reviewing a jury's finding that a defendant is not mentally retarded, we consider all of the evidence relevant to the mental retardation issue and determine, with "great deference" to the jury's finding, whether this finding is "so against the great weight and preponderance of the evidence so as to be manifestly unjust." *See Neal v. State*, 256 S.W.3d 264, 273 (Tex.Cr.App. 2008) (appellate court affords "great deference" to jury's finding that defendant is not mentally retarded because jury is in the best position to assess witness credibility and to resolve conflicts in the evidence); *Gallo*, 239 S.W.3d at 769-70.

Appellant claimed at trial that he is "mildly" mentally retarded. This issue was thoroughly

and exhaustively litigated before the jury during appellant's trial with each party presenting expert and nonexpert testimony on the issue of whether appellant is mentally retarded under the three-part AAMR definition of mental retardation. This issue was submitted to the jury at the punishment phase, and the jury found that appellant is not mentally retarded.

Appellant claims on appeal that the evidence "clearly shows that [he] is mentally retarded." Most of the testimony relevant to appellant's mental retardation claim is set out in volumes 52 through 57 and 59 of the reporter's record, comprising approximately 1,900 pages (not including the voluminous exhibits). Citing to "R.R. Vol. 56, Pg. 6, et. seq.," appellant's brief asserts that "defense expert [Tom Allen] testified at length regarding Appellant's mental retardation." This is the only citation to the voluminous record that appellant's brief provides in support of the assertions set out in approximately five pages of his brief purportedly describing all of the evidence relevant to the issue of appellant's mental retardation. *See* TEX. R. APP. PROC. 38.1(f) (requiring that statement of facts in brief "must be supported by record references").

The State claims that appellant's "lack of record citation results in a five page narrative fiction in the stead of a record-referenced 'Statement of Facts' as required by" Rule 38.1(f) and that this "Court is not required to shift (sic) through the very voluminous record of this case in order to find the information that Appellant has not provided." The State also suggests that the record does not support several factual assertions in appellant's brief.

Although we are inclined to agree with the State that we can dispose of this point of error as inadequately briefed, we have decided to sift "through the very voluminous record" and dispose of this point of error on its merits. We believe that the following discussion of the record fairly and accurately describes the evidence relevant to appellant's mental retardation claim.

The evidence in this case shows that on July 9, 2005, the then 21-year-old appellant broke into the home of a 93-year-old woman and beat and stabbed her to death. The medical examiner testified that there was also evidence of strangulation. Appellant placed the victim's body on a bed and set the victim's body and the bed on fire. One of the police detectives involved in the case testified that this destroyed incriminating evidence. Appellant stole the victim's car and other property belonging to her. Appellant also threw away the clothes that he was wearing, disposed of the murder weapon, and lied to his family and to the police about his involvement in the offense. Appellant initially denied any involvement in the offense, but eventually told the police that Jamarist "Monterral" Paxton, an acquaintance, forced him to participate in the offense and that appellant's involvement in it was minimal. The police were unable to find any other evidence to substantiate this claim, and Monterral testified at appellant's trial that he was not involved in the offense. The overwhelming weight of the evidence supports the State's factual theory that appellant acted alone in murdering the victim.[4]

The evidence also shows that appellant was born on August 21, 1983. He was raised by his mother until she died when appellant was in the sixth or seventh grade, at which time appellant went to live with his father and step-mother. Evidence was presented that appellant's mother practiced voodoo and may have been mentally ill. She was not abusive, and appellant was close to her. For example:

Q. [STATE]: Now, if we had–able to take kind of a snapshot of your life at that

---

[4]

The State also presented evidence at the punishment phase that appellant sexually assaulted the victim (in the form of appellant's statement to the police that Monterral sexually assaulted her). The State's theory was that references in appellant's statement to Monterral actually referred to appellant's actions.

point, then, your mom is either–has your–you're born five years–[appellant] is born five years later than [appellant's sister] is born. She's taking care of all these kids and at no time was she physically abusive–at some point around age 10, she becomes–begins to use profanity. Her conduct is embarrassing to you kind of in the neighborhood. And there was one to four times that she would have put red pepper on you,[5] but never a situation where she was beating or abusive?

\* \* \*

A. [APPELLANT'S OLDER BROTHER]: You could say that.

Q. [Appellant's] relationship with his mom, how would you characterize his relationship? He loved his mom?

A. Very much.

Q. And you, too?

A. Right.

Appellant made many passing and above-average grades in school until he dropped out in the twelfth grade.[6] Several of appellant's family members and several of his school teachers testified at trial, none of whom testified that, at the time of this developmental stage of appellant's life, they thought that appellant was mentally retarded. At about the age of 15, appellant began to associate with the "wrong crowd" and to take drugs. Appellant also became sexually active at this time. Appellant also learned how to drive a car (even though we understand the record to reflect that he

---

[5]

This was part of the mother's voodoo rituals to ward off evil spirits.

[6]

Evidence was presented that appellant repeated the first grade. His first-grade teacher (Dobroski) testified that appellant's first-grade, year-end averages for "language arts was 68; reading 63; spelling, 69; writing 75; English 77; mathematics, 85; science 78; social studies 84; health, fine arts, and music satisfactory; and physical education excellent." Dobroski testified that the "scores in reading, spelling, and language arts" were below the passing level of 70. She testified that this could have been because appellant, with what Dobroski described as a "late birthday" in August, was too young and really not ready for the first grade. Dobroski testified that she did not have any indication that appellant "was a mentally retarded child or needed to be tested for that." Dobroski testified that appellant successfully repeated the first grade "with a 25-point difference in his scores." Appellant's "lowest grade [was] 85, 85 with a range to 96, with an 88 in reading and language arts."

never obtained a driver's license). It was also around this period of time that appellant became a disciplinary problem in school.[7] Appellant's I.Q. was never tested prior to the age of 18. The State suggested, through its cross-examination of one of the defense experts (McClure), that this was "because no one thought [that appellant] needed" to have his I.Q. tested. Appellant also had jobs in fast food restaurants such as a Kentucky Fried Chicken for short periods around this time. He was capable of taking customer orders inside and at the drive-through windows, handling money, and getting the meals ready to be served to the customers.

The defense attempted to diminish appellant's passing grades in school with evidence that appellant may have been "socially promoted"[8] and that he was unable to pass all portions of various standardized tests that he took during his school years. The defense also presented testimony that appellant was at times a "504 student" with "special needs" before he entered high school.

Evidence was presented that a "504" program is not the same as a "special education" program where mentally retarded students might be placed. Evidence was also presented that appellant was never a "special education" student and that a "special education" student would probably have been exempted from taking the standardized tests that appellant took. For example:

> Q. [DEFENSE]: Okay. Did you find any evidence in the record to indicate that [appellant] had been in special ed. classes?

---

[7] One of appellant's high school teachers (Riley) testified that appellant performed poorly in his class and was a disciplinary problem with one incident involving appellant sticking another student with a safety pin. Riley testified that he believed that appellant was able to perform properly but that appellant "was disinterested, unwilling to do the work."

[8] Several of appellant's school teachers denied this. For example, appellant's first-grade teacher (Dobroski) testified that appellant earned his good grades that ranged from 85 to 96. Appellant's seventh-grade teacher testified that appellant earned his passing grades and that appellant "was fully capable on a seventh grade reading level."

A. [DEFENSE EXPERT TOM ALLEN]: No, none that I could find.

\* \* \*

Q. [STATE]: Okay. If a person is in the special education program, would they ever take a TAAS or TAKS [standardized] test?

A. [DEFENSE EXPERT TOM ALLEN]: No. They're exempted from that.

Q. Okay. So the fact that [appellant] took a TAAS or TAKS test tells you that he was not in special education. Would you agree with that?

A. Pretty much, yeah.

\* \* \*

Q. [STATE]: Can you have highly intelligent people in 504?

A. [DEFENSE EXPERT PATTON]:Yes, you can.

Q. Can you have highly intelligent people in the special ed. That deals with the IDEA, whatever that one is? Would you likely see highly intelligent people in that special ed. program?

A. Not typically, no.

Q. Okay. So–because 504 accommodates people that have a special–that need a special–an accommodation to learn in an environment?

A. Most of the time, 504 is related to accommodations, that's correct.

\* \* \*

Q. [STATE]: 504. I'm thinking 501-K savings program.

A. [STATE'S EXPERT GRIPON]: 504 programs are not special education. That's not a retarded group, that's not special education. That's special needs, and special education are not the same thing.

Appellant was homeless "off and on" from the time that he dropped out of school in the twelfth grade until he committed this offense in July 2005. Appellant's drug use also continued during this period of time. At the time of the offense, appellant was unemployed and living alone in an apartment. He was capable of understanding his *Miranda*[9] rights and of coherently and

(continued...)

voluntarily making statements to the police (and lying in his own interests).[10]

Appellant presented the testimony of a psychologist (McClure) who does diagnostic disability testing for the Social Security Administration. McClure evaluated the then 19-year-old appellant in August 2003 for social security disability benefits and diagnosed appellant as "mildly" mentally retarded and as suffering from some form of schizophrenia.[11] McClure's "mild" mental retardation diagnosis was based on appellant's full-scale score of 63 on the Wechsler Adult Intelligence Scale Version III I.Q. test (the WAIS III) that McClure administered. It was also based on the results of the Wide Range Achievement Test (the WRAT), which indicated that appellant's reading, writing and arithmetic skills were at a fourth-grade level.[12] McClure's diagnosis was also based on statements that appellant and his father made to McClure, including appellant's statement to McClure that he did not use drugs and appellant's father's statement to McClure that appellant was a "special education" student in school.

> Q. [DEFENSE]: Okay. Why was [appellant] at your office?
>
> A. [MCCLURE]: He was tested, because his family had applied for Social Security disability for him, and so I had–Social Security requested that I test him to determine his functioning level.

---

[9](...continued)
*See Miranda v. Arizona*, 384 U.S. 436, 467-69 (1966).

[10]
We note that a defense expert (Kate Allen) testified that appellant was not a very good liar.

[11]
Appellant also presented the testimony of a clinical psychiatrist (Davis), who diagnosed appellant in March 2004 as suffering from paranoid schizophrenia for which Davis prescribed an anti-psychotic medication called Abilify. Davis testified that he would be surprised if appellant's schizophrenia caused him to commit this crime even though another defense expert (Kate Allen) testified that appellant's schizophrenia was a factor in the commission of this offense.

[12]
Appellant's step-mother (Nell) testified, however, that appellant "read fairly well."

\* \* \*

Q. Okay. Dr. McClure, what's involved in evaluating a person to determine whether or not they are mentally retarded?

A. Okay. What Social Security wants me to do is–get his history, and usually in his own words. Then you do some specific types of testing, like psychiatrists do, that are mental status exam and general functioning of the client. And then you do some specific tests. In this case, I–for intelligence, I–I used the Wechsler Adult Intelligence Scale Version III to measure his intelligence, and then I used something called the Wide Range Achievement Test to measure his academic ability, his reading, writing, arithmetic.

\* \* \*

A. When you're looking for mental retardation, you have to have three criterion to be met.

First is a tested I.Q. below 70. And on the WAIS, he tested at 63, so he met that criteria.

Second, you have to have–this problem occurred before the age of 18. And from the history that his father gave me, his problems were many years before that. He had a history of–of problems. He was in special education. This is what his father told me, and he was only reading and writing at a fourth grade level.

\* \* \*

The adaptive functioning is the third criteria, which means he was not functioning too well, and he was having trouble keeping a job. He had trouble with his relations with his family. He was–he was confused. He himself couldn't give me really good history information. He was very confused. For example, he'd spent six months in jail in Rusk, and he couldn't tell me why.

\* \* \*

So, anyway, his functioning level wasn't very good. You put those three things together, the low I.Q., and he tested 63, it was before 18, and his functioning level to reach a conclusion of mental retardation.[13]

Q. Okay. So now, with respect to the–to the adaptive deficits, the information that you received was the information that you received from his father, Willie Williams?

A. Yes, that's correct.

\* \* \*

---

[13]

    With respect to the adaptive behavior deficits of the AAMR definition of mental retardation, McClure testified that "you only have to find significant limitations in adaptive behavior in two of the eleven" categories of adaptive behavior "in order to find that a person is mentally retarded."

Q. Okay. You made a diagnosis of–of schizophrenia?

A. I did, yes.

\* \* \*

A. He was hallucinating and he talked to the walls and had a lot of confusion problems. He couldn't really give me much in the way of history. I had to get most of the history from his father, so he had some major problems.

McClure was surprised to learn on cross-examination that appellant's father's statement to him that appellant was in special education was not accurate.

Q. [STATE]: Let me show you, you know, he was never in special ed. classes in school?

A. [MCCLURE]: That's what his father told me. That's all I know.

Q. No. He was not in special ed. Tyler Independent School District, there are no records that indicate [appellant] was in special education in the Tyler Independent School District. Does that surprise you?

A. Yeah.

McClure also testified on cross-examination that appellant's above-average school grades were "contradictory" with a 63 I.Q.

Q. [STATE]: Look at the grades he's making.

They're–let me start with–would you expect [appellant], growing up, his grades would have been pretty bad?

A. [MCCLURE]: From what I saw I would have expected that, yeah.

Q. Let me show you some records from Jacksonville where he went to elementary school. "Hard worker, good student." A student being promoted, yes,; special ed., no. As it goes through these are a lot of records you will have to look through them. Let me get you to the gist of it–hang on one second, Doctor, turn to the right page.

Here's his grades. Now, he's not in special classes. Reading, 88, 78, 79. You see how it goes on through here? His grades are 90, 96. Mathematics, science, social studies, is that kind of surprising?

A. Yeah, but a lot of school districts are very easy graders. I've discovered from

testing, Social Security, you can't–grades in school don't mean anything. You have to give them tests to see what they're (sic) actual functioning is, because a lot of schools grade too easily and don't expect much.

Q. Well, do you find that with four school districts?

A. No, I wouldn't find that in all school districts.

Q. Let me show you–here's one with Moore Middle School. This is 8th grade math. He's making a 91, and 83, a 79. Would–that's stuff you would like to know, wouldn't it?

A. Yes. Sure.

Q. Look in social studies. He's making an 82, and this is not–remember he's not in special ed. Reading, 75, 88, 67. I mean, you could go through here and pick them, but that's 8th grade. Let me see. I have a hard time–I think we get to more report cards over here. Here's 10th grade. I'll go back and find those.

A. Do you have an I.Q. from back then?

Q. There was no I.Q. test administered to him prior to the age of 18.

Look in here. Well, here's auto tech, 87, 93, 91 and 100. 10th grade geometry, 81, he's making English II, here he makes a 50, a 50 and a 30. But you go over to 11th grade English, 71, 76, 79. Reading, 83. And this is John Tyler High School. He's making in geometry, 71, 80, 85. I mean, how is he making grades that are some of them A's and B's in mainstream, nonspecial ed. classes and be retarded?

A. That's a good question. I wish I had that information before I had my–I done my report. You've got other factors here to.

* * *

Q. I guess the thing is, Doctor, that I'm getting at–let me show you State's Exhibit 328. He is–you've seen Jacksonville, his grades. Then you move over to Boulter school. He's got in social studies 72, 77, 75. Math he's making an 84. Reading an 80. That's the seventh grade.

If you look at some of the final grades here, math he's got an 84, 74, 79. That's 8th grade–or 7th grade.

The–here's some–this is better, an easier way to read it, 7th grade. But you're looking at a guy who is making pretty–science, in one part, he makes a 94.

Then you can go over to Moore Middle School. And I'll have to find those grades.

But all through here at different school systems, he's making–or different schools, he's making good grades, would be very inconsistent with a I.Q. of 63, would it not?

A. I would think so, yes.

\* \* \*

Q. So, I mean, I guess the point of it is, Doctor, is (sic) he's going–he's going to high school, John Tyler, he's making average grades, sometimes A's. He's not in 504. He's not in special ed. He hasn't been identified or showing the need to either one of those. How does that correlate to your I.Q. test? That's the bottom line.

A. It doesn't. It's contradictory.

McClure also testified on cross-examination that "one time of [I.Q.] testing" could be "more accurate than grades over nearly a 12-year period of time" but that he could not be sure if that was true in appellant's case. He also testified that the Social Security Administration did not pay him enough to do a more thorough evaluation of appellant that he would have done in a "private clinical setting." McClure also testified on cross-examination that misrepresentations that appellant and his father made to him were significant and could have compromised his "determinations in the adaptive functioning."

> Q. [STATE]: Right. And in this case, they have misrepresented the special education, misrepresented he did poorly in school, misrepresented problems with drugs and alcohol.
>
> Are those three significant areas?
>
> A. [MCCLURE]: Yes.
>
> Q. Okay. Do you believe that could have compromised your determinations in the adaptive functioning? Not it's [sic] your fault, but based on the information you had?
>
> A. It could have, yes.[14]

_____

[14]

The State argues on appeal, as it did at trial, that appellant "was completely motivated to try to score as poorly as possible during his IQ testing with Dr. McClure" and that he deliberately misled

(continued...)

Appellant was awarded social security disability benefits, apparently based on McClure's report.[15] Appellant's step-mother (Nell) testified for the defense that she was the payee of appellant's social security disability benefits, which she used to take care of appellant including paying the rent for the apartment where he lived alone when he committed this offense.

Q. [DEFENSE]: Okay. So after you got benefits started for him . . . what, if anything, did you do relative to living arrangements for [appellant]?

A. [NELL]: Well, I took care of his bills, bought his groceries, you know. I took care of him.

Q. Okay. And that was when he was living in the apartment--

A. Yes.

Q. –that he was living in when all of this took place?

A. Yes.

Q. Now, after he–he moved into the apartment, was anybody really living with him at that time?

A. No.

Nell testified on cross-examination that appellant had the ability to go into a grocery store and "to pick out what he wanted, go to the check-out and pay for it." She also testified that she saw appellant work the cash register and the kitchen when he worked at Kentucky Fried Chicken.

Q. [STATE]: Did you testify that–that he would go in to buy groceries, and he would

---

[14](...continued)
McClure "regarding crucial background information" in order to obtain disability benefits.

[15]
McClure testified that he just does the testing and sends in his reports to the Social Security Administration and does not know whether benefits are awarded (McClure testified, "I don't make that decision. It's up to Social Security to make the decision. I just do the testing and send in my report.").

buy snack foods, potato chips and snake (sic) cakes?

A. [NELL]: That's correct.

Q. All right. Stuff that y'all felt was–was not what he should be buying, not nutritious?

A. Wasn't food he could make a meal on.

Q. Okay. So it wasn't that he did not have the ability to go and buy the food; it was that you did not feel that the food was what you could make a meal on?

A. He didn't have the knowledge of what he needed to go in the store and buy groceries for the month.

Q. Okay. Now, let me start with this. Could he go pick out what he wanted and walk to a cash register and pay for it?

A. He put that snack stuff in the buggy and go to the check-out.

* * *

Q. Did he have the ability to walk up to a cash register and pay for it?

A. He had the ability to walk up there and pay for it.

* * *

Q. Okay. And one of the things that you testified to is that he could not cook; is that right?

A. That's correct.

Q. Okay. What did he do at KFC?

A. I mean, I seen him fixing food. I've seen him drip fries–I haven't seen him just cook cook. I don't think I ever seen him frying chicken. I could have, but I'm not going to say. But I know I've seen him drop fries.

* * *

Q. Well, I mean, because the testimony kind of is that he didn't know how to buy for himself; he might be limited only to a microwave. But, in fact, he's working at KFC back in the kitchen putting stuff together–I mean, looking up at an order and putting the order together, handing it out to someone, and as you put it, very possibly cooking the chicken. Does that seem inconsistent to you?

A. I didn't say "very possibly." I said he could have. I don't recall seeing it.

Q. Okay. Well, okay. Does that seem inconsistent to you?

A. Considering cooking the–cooking a home meal, a meal at home, yes.

The defense also presented the testimony of another expert (Patton), who is a "consultant in the area of special education" specifically "related to individuals with disabilities." Patton offered an opinion that appellant "showed adaptive deficits" in "functional academics,[16] home living,[17] and community use."[18]

> Q. [DEFENSE]: Now, after you had an opportunity to conduct all these interviews and review the information and the written data and information that you had at your disposal, were you able to formulate an opinion as to whether or not [appellant] had significant limitations in adaptive behavior which had an onset prior to the age of 18?
>
> A. [PATTON]: Yeah. In my opinion, based on the interviews that I did, I felt comfortable with the idea that in the three areas that I mentioned before, that there was certainly some adaptive behavior deficits.
> * * *
> Q. What three areas were those?
>
> A. The three areas that I feel that there was certainly a lot of information that showed adaptive deficits was in functional academics, home living, and community use.
>
> I think there were adaptive issues in some other areas, but those were the ones–in my opinion, those stood out.

Patton testified on cross-examination that he cannot legally diagnose mental retardation in this State, that he is not a psychologist or a sociologist, and that he has never had a clinical practice where he saw patients for the purpose of making mental retardation diagnoses. Patton also testified

---

[16]

The "three major areas" of "functional academics" are "reading, writing, mathematics."

[17]

This would involve "things like cleaning and cooking and using tools, things of that nature, organizing the house, vacuuming, laundry, things of that nature."

[18]

This would involve "the ability for the individual to be able to use whatever resources, whatever services and resources are available in a community" such as being able to use the public transportation system (i.e., riding the bus).

on cross-examination that a letter appellant wrote in jail to Nell and his sister asking for money was "meaningful in the sense that individuals sometimes need money, and they ask for it." He also testified that his notes indicated that appellant was not spending all of his money at the jail commissary on candy.

Q. [STATE]: Now, when you went up and talked to [Nell], she gave you this. You asked her if [appellant] had written any letters to you?

* * *

A. [PATTON]: Yes.

Q. And she gave you this exact letter I'm holding right here, 339, did she not?

A. Yes.

* * *

Q. And how did the punctuation look on it?

A. You know, I looked at it closely at one point. It's a pretty simple–that first paragraph is a pretty simple narrative.[19]

Q. It says, "Dear [Nell] and Marsha, how are you doing, question mark. I hope you're doing good in good spirits. Sorry it took so long to write. Marsha, Daddy told me that you were working. That's good. Keep working. Also, I hope you're doing good in school. [Nell], just won't know how you doing, how you kids doing. Also, I'm 23 now. I've just turned 23 on 8-21-83. Also, if you could send me more money."

Let me stop right there.

What significance does it have to you, his ability to solicit funds?

A. I think it's meaningful in the sense that individuals sometimes need money, and they ask for it.

Q. He has the ability to select–they say he can't handle money. He has the ability to write, solicit money for commissary to purchase–what kind of things does he purchase in commissary you took down in your notes?

---

[19] Nell had described appellant's letters as looking "like, probably a 5th or 6th grader" with "all the sentences running together."

* * *

Q. Okay. Did he not purchase toothpaste?

A. I believe that's on there, yeah.

* * *

Q. So he has the ability to get soups, heat them on his hotpot, buy toothpaste and–would that indicate to you that he does have the ability to, number one, appreciate the value of what money is, to solicit it, and purchase things with it?

A. He can–I think there's a certain general sense of value that money can acquire things for you. In terms of the actual value of money, that's where it gets to be a problem.

Q. Well, he buys toothpaste and not Snickers bars, doesn't he?

A. Yeah.

Q. Well, I mean, I thought everything he bought was just gum and candy and all of these things that weren't good for him? He could certainly go down and take that money he gets from [Nell] and go buy a tootie-fruitie, couldn't he?

A. I think the point is in the commissary, there's a restricted list of things you can get.

Q. Well, he could spend every cent he had on candy, couldn't he?

A. I suppose he could.

The defense presented the testimony of another psychological expert (Tom Allen), who examined appellant after he committed this offense and diagnosed appellant as being "mildly" mentally retarded. Allen testified that appellant's full scale I.Q. score was 65, which is "within the mild range of mental retardation." Allen testified that appellant's school grades were not a good measure of his academic functioning, because these grades "often are really soft in terms of their accuracy." Allen did not interview any of appellant's school teachers, because he expected them "to defend their finding as far as their grades." Allen testified that appellant's inability to pass all portions of various standardized tests that he took over the years in school was a more accurate measure of his academic functioning. For example:

Q. [DEFENSE]: Did you find evidence from your examination of the records that he had passed any TAAS tests?

A. [TOM ALLEN]: Not in full.

Q. Okay.

A. From grade–the TAAS is required grades 3 to 8, and has components, at least the reading and the math component. But other sections at different grades. He never passed a complete TAAS test.

Q. Okay. So now in order to–in order to–strike that.

To be able to say that he quote, unquote, passed the TAAS test, would he have had to have passed all of the sections?

A. That's my understanding of the TAAS test. That's what it's for.

Q. Okay.

A. Is it to make sure kids learn, and they've got to pass it, both–if it's reading and math, you need to pass both.

Q. Okay. So if you pass the reading and math section and you–and you fail the science section, you haven't passed the TAAS test?

A. Right.

Q. You pass sections of the test?

A. Correct.

\* \* \*

Q. Okay. What does that tell you about his–his intelligence function, the results of these kind of [standardized] tests?

A. This kind of stuff is telling me he–despite the grades in class, he's already showing signs on objective testing that he is not learning.

\* \* \*

Q. Okay. He was not taking special education, and he was making all of these high grades in school. Isn't that inconsistent with your diagnosis [of "mild" mental retardation]?

A. No. His grades and his achievement testing are inconsistent, but that inconsistency actually helps my diagnosis.

I mean, this kid wasn't performing as measured by objective [standardized] tests of academic achievement, and yet he was getting grades, which, unfortunately, more so in the past than in the present, I hope, is more consistent with people who are mildly retarded. They often get socially promoted.

Allen also testified that assessing adaptive behaviors "can become more difficult when you're dealing with a mildly retarded person." Allen testified that such an assessment is based on "any number of things" such as interviews with the person, family members and teachers with "records becom[ing] important."[20] Allen testified that appellant had "a bunch" of adaptive deficits in areas such as academic functioning, daily living skills, and socialization. Allen ultimately offered his diagnosis that appellant is "mildly" mentally retarded under the AAMR definition of mental retardation.

Allen testified on cross-examination that Nell's testimony that appellant was capable of making A's in school was not probative, because "as a lay person, she really doesn't know what it takes to make A's." He also testified that he was "going completely on the reports of [Nell] or the father" with respect to his determination on adaptive functioning.

Q. [STATE]: So you are going completely on the reports of [Nell] or the father as to your determinations on–as far as interviews, on adaptive functioning?

A. [ALLEN]: Right. I tried to get a lot of my information from them as caretakers during that time period, from the time that he lived with Nell and his dad, up to age 17 or beyond.

Allen also testified on cross-examination that the facts of appellant's crime were not relevant to his diagnosis that appellant is mentally retarded. Allen testified that a 10-year-old would have been capable of committing this crime.

---

[20]

Allen also agreed that significant limitations in just two out of eleven categories of adaptive functioning are required for a mental retardation diagnosis.

Q. [STATE]: Okay. Then did you ask him about it to find out–I mean, he is–he's breaking into a house, there is a–a breaking in of a residence; there's an arson where he successfully sets a bed and a person on fire; there's the disposing of the knife and the purse, eventually his clothing; the driving of the vehicle; the lying to his relatives; the lying to police officers; and then the–I guess different lies that are told to different individuals over that next week.

Would none of that be relevant from–would it not be important for you to ask him the specifics of that offense in making your determinations in any way as to whether or not he's a mentally retarded individual?

A. [ALLEN]: No. First of all, I can't go in there and take his confession if my job is to find out if he's [mentally retarded]. It's just inappropriate. I'm not sure it's legal or even ethical to put confession evidence in my report.

Secondly, the complexity you're describing is not a complex, violent crime. I mean, a 10-year-old can do all of those things. Literally, they can break into houses. They can kill people. They can try to drive cars and wreck them. That I had to interview him in terms of the specifics of the murder to determine if he was [mentally retarded] is just false. You just don't have to do that.

The State presented a psychological expert (Proctor), who also examined appellant after the commission of the offense. Proctor offered an opinion that appellant is not mentally retarded.[21] Proctor defined mental retardation consistently with the AAMR definition.

Q. [STATE]: What is the–first of all, what is the definition of mental retardation?

A. [PROCTOR]: Well, there are different definitions of mental retardation, but there's basically one thing that all the definitions agree on, and there are three prongs.

You have to have significantly subaverage intelligence. Now, what does significantly means (sic)? That means that you're in the bottom 2 percent or 3 percent. So 97 to 98 percent of people are above you. That's the first thing.

The second thing is you have to have significant deficits in adaptive behavior. Again, what does significant mean? It means that 97 to 98 percent of the people can engage in that behavior at a level higher than you or typically–routinely do.

---

[21] Proctor also suggested (without making a diagnosis) that appellant may have been exaggerating or faking his mental-illness (i.e., schizophrenia) symptoms.

And then last thing is this has to be prior to the age of 18. It has to be present during what we call the developmental period.

Those are really the parts of the definition no matter who's providing it to you, whether it's the Diagnostic and Statistical Manual you've heard us talk about, DSM-IV, or if it's the AAMR, which is the mental retardation organization, or if it's the Texas Health and Safety Code. Regardless of where the definition is coming from, it has those facets.

Proctor testified that he did not believe that appellant is mentally retarded or that his history is consistent with mental retardation. Essentially, Proctor testified that he believed that appellant may be "below average" but not in the mental retardation range.

Q. [STATE]: Let me talk a little bit about–I guess let's start with this: Do you believe that [appellant] is a mentally retarded individual?

A. [PROCTOR]: No, I do not.

Q. In total, is his history consistent with a (sic) mental retardation?

A. No. My opinion is that his history is not at all consistent with a mentally retarded individual.

Q. And why not?

A. Well, there are really a lot of reasons. I mean, one, just looking at his educational record, you've heard a lot about the fact that the grade card is indicative of a mentally retarded person (sic). That's certainly true.

You've heard the teachers say they didn't view him as mentally retarded, someone who needs special education. That's certainly true. He was not in special education. He was in this Section 504, which is not special education, for one year in the sixth grade,[22] but he was not in special education services.

And we're not talking about somebody who's now 40 or 50 years old. This is somebody who is now 23, who was going through the school system when using

---

[22] The record does not clearly indicate that appellant was a 504 student "for [only] one year in the sixth grade." The record appears to support a finding that appellant may have been a 504 student at different times prior to entering high school.

things like special education are prevalent.

The last thing with regard to education, there's been a lot of talk about these TAAS tests, the Iowa test. His performance on those tests was below average. It wasn't average. He didn't meet minimum standards. That's true. At least some of the times, he would pass math and not pass reading, not pass spelling.

But, again, we're talking about mental retardation. We're not talking about below average. We're saying is this person in the bottom 2 to 3 percent. Well, if you look at those scores, there's a lot of those that are in the 50th percentile. That's right there at average. That's not in the second percentile or third percentile.

That's not consistent, and you don't–you know, mental retardation is something that's consistent over time. You don't see somebody who's mentally retarded getting lots of scores in the 50th percentile. That's just not consistent with mental retardation. So that's one part of it.

The people who knew him didn't think of him as mentally retarded. He wasn't labeled as mentally retarded during the developmental period. The type of work he did, yes, it was fast-food work, but he was hired like by KFC, worked for a while, was doing work as a cook, cashier, drive-through, leaves and then gets rehired.

Most people, if you have a mentally retarded individual and you hire them, you would think it doesn't go well, and you're not going to hire them again. They hire him again. He gets a merit raise for pay, and all these types of things.

When you look at it, it just doesn't look like a mentally retarded individual.

Proctor also testified that he gave appellant five different I.Q. tests. Appellant's scores on these I.Q. tests were 71,[23] 78, 70, 83 and 73-74. Proctor also described appellant's adaptive behavior as "being well above the mentally retarded range." He testified that appellant had deficits in adaptive behavior, but not significant deficits in the "bottom 2 to 3 percent."

Q. [STATE]: What is adaptive behavior?

---

[23]

Appellant scored this 71 on the Wechsler Adult Intelligence Scale (WAIS III). Appellant scored a 63 on this same I.Q. test when McClure administered it to appellant in 2003 when appellant was applying for social security disability benefits.

A. [PROCTOR]: Well, adaptive behavior, and it's a little difficult sometimes to define it without using the word adaptive, because it's the way you conform and, you know, make do and adapt to the world in specific areas, the way you adapt in terms of functional academics, the way you adapt in terms of your home living, the way you adapt in terms of your self-care, your hygiene, the way you adapt in terms of communication.

It's the abilities that you have and how those abilities allow you to adapt to the world around you.

Q. In looking at the–let's talk about your review of the records, your interview of [appellant], your interview of the 23 teachers,[24] and ten additionally, six or seven family members.

A. Seven.

Q. Seven family members. Let's talk about that assessment alone.

Did you believe [appellant] had significant limitations in adaptive behavior?

A. No, I didn't, and I don't.

Q. In fact, how would you characterize his adaptive behavior based on the review of the 3,000 pages of discovery, the interview of the 23 teachers, the 7 family members, and of the defendant?

A. I would describe it as being well above the mentally retarded range.

Q. As you talk about that–and we'll talk about this a little bit more–are there examples you can draw from to better explain that or things that stuck out to you specifically when you looked at those areas of adaptive functioning and whether he had significant limitations in adaptive functioning?

A. There definitely are. There are a lot of examples, and a lot of them are the things that I started to go into in the beginning when I talked about his educational background, and the fact that, you know, his teachers didn't see him as mentally retarded or special education, the grades that he made, that his performance on standardized tests, even though he often was below average, didn't pass, that it wasn't in the bottom 2 percent, 3 percent, his work history, how he lived on his own, the things that he did when he lived on his own, and things like having your own

---

[24] The record reflects that none of the defense experts interviewed any of appellant's teachers.

apartment, riding a bike, cooking meals for yourself, working as a cook, working as a cashier, going to the gym, being able to walk around town, using the bus system, you know, driving a car.

There were lots of things that weren't consistent with the adaptive deficit.

\* \* \*

Q. I mean, when you're looking at adaptive deficits and functioning, significant limitations in adaptive functioning, then you mentioned earlier that your are saying that 97 to 98 percent of the people alive do these adaptive functioning skills better than you?

A. That's what it should be. I mean, like Dr. Tom Allen said, we're talking about two standard deviations below the mean. That's just a statistical term.

What that means is the bottom 2 percent, or at most, you can say 3 percent. So 97, 98 percent of the people perform these behaviors better than that. If it's significant deficit in adaptive behavior, it's significant because you're below the top 97 or 98 percent.

\* \* \*

Q. [DEFENSE]: Did you find any deficits with respect to [appellant] as far as adaptive functioning is concerned? Just one?

A. [PROCTOR]: Deficits or significant deficits?

Q. Deficits?

A. Yeah. I mean, sure. Everyone has deficits. I found deficits. I didn't find significant deficits.

Q. You didn't find a single significant deficit?

A. Well, if you have two significant deficits, you would be mentally retarded. I didn't find any significant deficits consistent with the lowest 2 to 3 percent.

Proctor "disagree[d] with several of the areas that [defense expert Patton] said he saw adaptive deficits in." In addition to questioning some of the methodology used by defense expert Tom Allen, Proctor also suggested that the information relied upon by Allen (particularly information provided by appellant and his family members) could have potentially been "very biased" because of the "legal situation" that appellant was in.

Proctor also addressed defense expert McClure's mental retardation diagnosis of appellant when appellant applied for social security disability benefits before he committed this offense. Proctor suggested that McClure's diagnosis was based on incomplete and possibly biased information.

> Q. [STATE]: Tell the jury–when you're talking about like Dr. McClure, for instance, is as nice a gentleman as he is and very qualified, and I'm certainly not trying to shed any light on that, in the clinical setting of that type of diagnosis that he's doing, explain kind of about that to the jury.
>
> A. [PROCTOR]: Well, Dr. McClure is doing what he was asked to do for Social Security Administration, for these–they're called consultative examinations. That's what he did. It was requested by Social Security.
>
> They send the person over to him. He has no records or very little. In this case, none. They ask him to give an I.Q. test, which he did, to just talk to the people who are there, his father and him.
>
> And, you know, there's not an assessment of adaptive functioning. They have certain areas for Social Security they wanted him to ask about, but not a matter of going through adaptive functioning.
>
> And basically, he has to rely upon what he's told in the tests. As was the case with his evaluation, they don't typically give measures of malingering or effort. That's not part of the typical Social Security evaluation, so it's different.
>
> Q. Not to be critical of it, it's just a different setting?
>
> A. Right. It's not done to be applied in this setting. It's done for another setting.

Proctor also testified that Social Security Administration records indicated that appellant was awarded social security disability benefits "on more of a mental illness issue, not a mental retardation issue."

> Q. [STATE]: Okay. There was records in the Social Security–excuse me–there was specifically in the Social Security records, he was given Social Security disability benefits?
>
> A. [PROCTOR]: Yes, he was.

Q. Was that done on the basis of mental retardation?

A. No, it wasn't.

Q. What was he given Social Security disability for, if that's a proper question?

A. Right. Well, there's a classification system for rating if someone is disabled. The first thing would be if they meet criteria for any of the mental disorders; one of them being mental retardation.

It was determined that [appellant] did not meet criteria for that or for schizophrenia, but it was the case, based on the record they had, and in particular Dr. McClure's report, that they decided that he was unable to complete a normal work week, workday or work week without being interrupted by psychologically based interruptions, which is basically in line with someone who's not having a problem with intelligence, but with someone who's having some kind of mental illness issue, like some type of psychotic disorder.

Q. So he was given the disability then on more of a mental illness issue, not a mental retardation issue?

A. He was given on the mental issue; that's right.[25]

Proctor testified on cross-examination that appellant's standardized test scores were not indicative of mental retardation, because "they weren't in the bottom 2 to 3 percent consistently."[26]

Q. [DEFENSE]: The–you heard testimony about–and I believe from Dr. Patton as well–about deficits in education. Do you believe [appellant] has significant deficits–significant limitations in adaptive functioning, which is a standard in education?

---

[25]

Proctor testified that he is also a "psychologist for the Social Security Administration" and that he testifies "when people are applying for disability." Appellant's social security records (part of defense exhibit 8) do not clearly reflect the basis upon which appellant was awarded social security disability benefits. For example, parts of these records seem to indicate that this award was based on the diagnoses of schizophrenia and mental retardation while other parts of the records seem to indicate that the mental retardation diagnosis did "not precisely satisfy the [required] diagnostic criteria" with a handwritten notation of "Possible MR, denied Special Ed."

[26]

Appellant's expert (Tom Allen) had also testified that 2 to 3 percent of the population is mentally retarded.

A. [PROCTOR]: It's technically called functional academics. And, no, you know, as I said, I mean, I went through, at the beginning, his education record, you know, not just his grade, not just his teachers, but even these standardized tests, they weren't in the bottom 2 to 3 percent consistently.

A lot of the scores were above that. He did pass them at times. That's not consistent with a mentally retarded individual.

\* \* \*

Q. Okay. What did the school records--

A. The school records showed that [appellant] attended school beginning in the first grade, that he repeated the first grade, that his grades improved, that his grades tended to be pretty good during the early time before his mom passed away, that he wasn't a discipline problem during that time, that he was described as a good student; that during that time he did start taking standardized tests such as the Iowa Achievement Test as well as the TAAS, that his scores on those tests were above the 2nd or 3rd percentile but were below average.

He did fail some of the subtests of the TAAS and never passed all of the subtests at the same time, and that as he got older and he was in Tyler school district, he started having behavioral problems and was written up and in trouble for behavior.

It doesn't indicate that he was in special education, that he had problems communicating with teachers, that he couldn't handle kinds of basic instructions and communicate with others, handle practical–socializing and interacting with others, that type of thing.

\* \* \*

Q. And did you take a look at the standardized tests that [appellant] took at the end of each school year?

A. Yes.

Q. And did you happen to notice that the standardized tests indicated that he had generally scored low–not in every area, but he had generally scored low throughout his academic career and also that he had never passed a TAAS test from grades 3 through 8?

A. I would agree with part of that.

Q. Okay. Did the tests tell you anything about [appellant] or reveal to you anything about [appellant's] cognitive ability?

A. Well, sure.

Q. What?

A. I mean, it's not a direct measure of a cognitive test, so it's not what I would strongly rely on in that way, but what it showed me was that he was performing below average on those tests.

Q. And what does that tell you about [appellant's] cognitive ability?

A. Well, that would be consistent with someone who has below average or borderline intellectual functioning.

Q. Or if you were looking at it prior to administering the test, it could be an indication of mental retardation?

A. No.

Q. Never could be that?

A. It's not in the 2nd or 3rd percentile, and there are scores well above that consistently. I mean, that's just not consistent.

Q. So you're saying that for school records–is it your testimony that for the school records to lend some value to whether or not a–whether or not you should consider the issue of mental retardation the person has to score 2?

A. You mean the 2nd percentile?

Q. Yes.

A. It should be somewhere near that. I mean, not having scores in the 50th percentile and passing, that's just not the flat pattern of performance that you see in a mentally retarded person. And it's not the percentage that you see as defined by the criteria.

The State presented the testimony of another expert (Gripon), who testified that appellant

"falls in the below average, above mentally retarded, borderline range of intellectual function."

Q. [STATE]: Let me ask you this: Do you believe [appellant] is a mentally retarded individual?

A. [GRIPON]: I do not. Now, I base that on my examination of him, reviewing the collateral information that I have looked at.

As we do any forensic–as I do any forensic examination, you make a determination

as to what you think the best estimate of that person's intellectual potential is. I think he falls in the below average, above mentally retarded, borderline range of intellectual function. He is certainly not bright.[27]

During closing jury arguments, the State argued that the mental retardation question came down to which expert the jury believed. The defense agreed and also emphasized that it was significant that McClure diagnosed appellant as being mentally retarded before appellant committed this offense.

> [DEFENSE]: Now, you know, they can ridicule Dr. McClure all they want to. They can talk about the fact that he didn't take enough time. He did what he needed to do to make the diagnosis. He made a dual diagnosis that [appellant] suffered from paranoid schizophrenia and that he was mentally retarded.
>
> He had a general intelligence score–intellectual functioning, a general intelligence score of 63. That's before you had the plus or minus 5.
>
> That finding was relied on by our government, the Social Security Administration, signed off by other professionals in that agency, which awarded benefits to [appellant] based on Dr. McClure's findings. It's a diagnosis. It's historical. It exists.
>
> The State wants you to ignore that. It wants you to go back retrospectively and say, well, Dr. McClure didn't do this, and Dr. McClure didn't do that. If he didn't do it, nobody prior to this time has ever questioned it.
>
> Nobody but the State of Texas questions the amount of time that he spent examining [appellant]. Nobody but the State of Texas questions Dr. McClure's findings. The United State's Government certainly did not question it because they awarded [appellant] benefits based on his conclusions.
>
> Dr. Proctor also had for examination the findings of Dr. Allen. Now, Dr. Tom Allen administered an I.Q. test, a full-scale–a full-scale I.Q. test to [appellant] at a time

---

[27]

Gripon also testified that "people that are mentally retarded are in the lower 2 or 3 percent of the population." Gripon also testified that appellant "presented as an individual with an I.Q. that is below normal and above retarded" and that "his functional capabilities are consistent with that level of intellectual potential." Gripon also testified that he had "serious question" about the diagnosis that appellant is schizophrenic.

when he was incarcerated awaiting trial in this case.

> Perhaps his findings might be a little suspect, okay, if it were not for the fact that his findings were wholly consistent with the findings of Dr. McClure, who had no dog in this hunt. His test results were wholly consistent with the findings of Dr. McClure.

The State responded that McClure was "making a diagnosis for benefits, not a diagnosis in the context of a capital murder case" and that appellant did not receive social security disability benefits based on a "diagnosis of mental retardation."

> [STATE]: When McClure examined him, McClure is examining him for Social Security benefits. He is a busy man, and he's a nice man. I have no problems with Dr. McClure whatsoever. And I've certainly never ridiculed him.
>
> Dr. McClure is operating, as he said consistently, they gave him a job to do. He is making a diagnosis for benefits, not a diagnosis in the context of a capital murder case as to whether or not a defendant is mentally retarded.
>
> And understand this, too: He was never given Social Security benefits on the diagnosis of mental retardation. Dr. Lankford came in, looked at him and reviewed that, and he was granted benefits under another provision or whatever.
>
> That's important to say for you to understand the context in which an exam or diagnosis is made.

A defendant, asserting a mental retardation claim in a death-penalty case, is entitled to the process of a "full and fair hearing" to establish this claim. *See Hall v. Quarterman*, 534 F.3d 365, 371 (5th Cir. 2008). We note that the process afforded appellant in this case, particularly of having the jury decide the issue of his mental retardation, was more process than that described in the Fifth Circuit's decision in *Hall*. *See id.*; *see also Gallo*, 239 S.W.3d at 770 (jury determination of mental retardation not constitutionally required). We further note that the jury made its determination that appellant is not mentally retarded after hearing the testimony of psychological experts from both sides in the field of mental retardation and others such as teachers, counselors and mental health providers who had contact with appellant before and after his incarceration. The jury did not have

to accept the defense claim that appellant's average and above-average grades over the course of eleven years in school, during which it occurred to no one that appellant might be mentally retarded, were inflated. We further note that appellant's scores on the portions of the standardized tests that he was unable to pass still were consistently above the range for mental retardation. The jury could have reasonably found that appellant's 70 and below I.Q. scores (out of other 70 and above I.Q. scores) do not truly reflect his academic functioning. The jury could also have reasonably found that any deficits appellant had in adaptive behavior were not within the range of mental retardation. The jury could also have reasonably determined that McClure's pre-offense diagnosis of appellant as being "mildly" mentally retarded was based on incomplete and inaccurate information as was the diagnosis made by Allen, who did not, for example, interview any of appellant's teachers. On this record, a finding that appellant is not mentally retarded is not so against the great weight and preponderance of the evidence so as to be manifestly unjust. *See Briseno*, 135 S.W.3d at 18. Point of error one is overruled.

In point of error three, appellant asserts that the "trial court erred by rejecting appellant's proposed instructions regarding mental retardation, especially in light of *Ex parte Briseno*." The record, however, reflects that the defense did not request any mental retardation jury instructions and expressly stated that it had no objection to the punishment charge submitted to the jury.[28] The trial

---

[28] The record reflects:

[THE COURT]: Now, the charge, as I gave counsel, there was [sic] typos on page 6 and 9 that Ms. Lacy pointed out. I made those changes and called up to the State so that they would be aware that we fixed those. Also, Mr. Thompson noted that verdict form on Special Issue Number 3, I had put "unanimously yes," and it should be "We, the jury, find because at least ten jurors so find and determine, by a preponderance

(continued...)

court, therefore, could not have erred "by rejecting appellant's proposed instructions," since the record reflects that appellant proposed no instructions.

Not having timely objected to the instructions actually submitted to the jury, appellant must establish that these instructions were erroneous and that they "egregiously harmed" him. *See generally Almanza v. State*, 686 S.W.2d 157, 160 (Tex.Cr.App. 1984) (op. on reh'g). Appellant claims that these instructions deprived him of a "fair determination" of the issue of whether he is mentally retarded. He claims that the "instruction given is arcane and almost incomprehensible" and that "[t]here was no way for the jury to adequately give meaning to the testimony of Dr. [Tom] Allen or the State's experts, and fundamental error is presented by the trial court failing to provide detailed jury issues, as presented in the motion for new trial, submitted in Appendix A, attached hereto."[29]

The issue of appellant's mental retardation was submitted to the jury during the punishment

---

[28](...continued)
of the evidence that the answer of Special Issue Number 3 is yes." I've cleaned it up. I've made new copies. Ya'll have the new copies now.

* * *

Okay. On behalf of the defense then, any other typos or objections to the charge?

[DEFENSE]: None, Your Honor.

[29]

Appellant has attached, as Appendix A to his brief, seventeen pages of jury instructions that he claims the trial court should have submitted to the jury. Appellant further claims that these instructions were brought to the trial court's attention as exhibits to his motion for new trial. The record, however, reflects that appellant's motion for new trial contained no such exhibits. Appellant's motion for new trial claimed only that the mental-retardation special issue "was not adequate and presented inappropriate instruction to the jury, as well as being submitted during a phase of the prosecution that tainted the fair consideration of such an issue by its presentation during the punishment phase of trial."

The State has filed an objection to Appendix A to appellant's brief and to "the false assertion that such [exhibits] were in fact presented via a motion for new trial because they are not attached to his Motion for New trial." The State claims that Appendix A should be stricken.

phase in special issue three, which asked:

> Is the defendant, CLIFTON WILLIAMS, a person with mental retardation?

Before being required to answer special issue three, the jury was provided with further

instructions on the issue of appellant's mental retardation. These instructions stated:

> In deliberating on Special Issue No. 3 submitted in this charge, the jury shall consider all evidence admitted at the guilt or innocence stage and the punishment stage of this trial.

> With respect to Special Issue No. 3, you are instructed that mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18.

> "Disability" is the expression of limitations in individual functioning within a social context and represents a substantial disadvantage to the individual.

> "Intelligence" is a general mental ability. It includes reasoning, planning, solving problems, thinking abstractly, comprehending complex ideas, learning quickly, and learning from experience.

> You are instructed that in reference to the "assessment of intelligence," the criterion for diagnosis is approximately two standard deviations below the mean, considering the standard error of measurement for the specific assessment instruments used and the instruments' strengths and limitations. In regard to standardized psychometric instruments you are instructed that the recognized standard of error of measurement is a range of five points higher or lower.

> "Adaptive behavior" is the collection of conceptual, social, and practical skills that have been learned by people in order to function in their everyday lives.

> You are instructed that in reference to the "assessment of adaptive behavior," for the diagnosis of mental retardation, significant limitations in adaptive behavior should be established through the use of standardized measures normed on the general population, including people with disabilities and people without disabilities. On these standardized measures, "significant limitations in adaptive behavior" are operationally defined as performance that is at least two standard deviations below the mean of either (a) one of the following three types of adaptive behavior: conceptual, social, or practical, or (b) an overall score on a standardized measure of conceptual, social, and practical skills.

You are instructed that in reference to "context," the assessment of context, although not typically accomplished with standardized measures, is a necessary component of clinical judgment and integral to understanding the individual's functioning.[30]

We do not agree with appellant that the "instruction given is arcane and almost incomprehensible" and that "[t]here was no way for the jury to adequately give meaning to the testimony of Dr. [Tom] Allen or the State's experts." The jury instructions are not glaringly inconsistent, if they are inconsistent at all, with our decision in *Briseno* and the AAMR mental retardation definition. Moreover, the extensive testimony presented on the issue of appellant's mental retardation and the parties' closing jury arguments make clear that this issue was litigated before the jury under the guidelines set out in *Briseno* and the AAMR mental retardation definition. On this record, we cannot conclude that appellant was deprived of a "fair determination" of the issue of his mental retardation or that he was "egregiously harmed" by the jury instructions so as to excuse his failure to timely alert the trial court to the objections to these instructions that he now raises for the first time on appeal. Point of error three is overruled.

In point of error two, appellant asserts that the "trial court erred in permitting the introduction of unsworn custodial comments by the appellant during the punishment phase of trial." Appellant claims that the trial court erroneously permitted the State to present to the jury "a virtual admission on the part of the Appellant, pursuant to interrogation by the presiding judge, submitted through the

---

[30] The jury was further instructed that if at least ten jurors determined that if appellant proved by a preponderance of the evidence that he was mentally retarded, then the jury should provide a "yes" answer to the special issue. The jury was further instructed to answer the special issue "no" if all twelve jurors determined that appellant was not mentally retarded. The jury was also instructed not to answer the special issue if "the vote of the jurors is not unanimously 'No' or not at least ten (10) in favor of an answer of 'Yes.'" In this case, the jury unanimously determined that appellant is not mentally retarded by providing a "no" answer to special issue three.

official court reporter for the court, regarding [appellant's] possession of a razor while incarcerated in the Smith County Jail" awaiting trial for this offense. Appellant further claims that this "statement" submitted by the State "through the product of the trial court's own interrogation, produced confirming evidence of the possession of a razor, where other State's witnesses, particularly being jail personnel, only had passing reference to the potential of the possession, rather than confirming evidence such as actual seizure and possession of contraband."

The genesis of this claim is found in the State's examination of a jailer (Miles) who testified about an occasion during which he saw appellant with a razor threatening "to kill his goddamn self" if appellant was not allowed to talk to a sergeant. Miles testified about how the jailers recovered the razor. He testified that he was sure that he saw appellant with a razor but that he had no idea what happened to the razor. When appellant muttered the word "shit" during Miles' testimony, the trial court excused the jury and explained to appellant the decorum that was required in the courtroom. During this exchange, appellant informed the trial court that he had "something to say" and made an admission that he had the razor.

> [THE COURT]: Mr. Williams, the reason I was looking at you is because you said the word "shit" in this court. You said it loud enough so that I could–just one second. I didn't ask you for a response.
>
> Have a seat, sir.
>
> I didn't–and I–you should know that this Court makes sure there is quiet and decorum in this courtroom
>
> [APPELLANT]: Yes, ma'am.
>
>                                          * * *
>
> [APPELLANT]: Ma'am, I have something to say.
>
> [THE COURT]: I'm going to let you say something in a minute. But, you're going to listen to me first.

[APPELLANT]: Yes, ma'am.

[THE COURT]: You cannot say things out loud in front of this jury.

[APPELLANT]: Yes, ma'am.

\* \* \*

[THE COURT]: Now, what is that you want to say to the Court?

[APPELLANT]: Ma'am, I would like to say that this officer or wherever–wherever he work now, that he–he telling a lie, because I said, "This ain't gonna look cute," **and I had a razor**. I'm telling the truth. You know what I'm saying? I said, "This ain't gonna look cute." "This ain't gonna look cute."

(Emphasis supplied).

Through its cross-examination of Miles and another jailer (Brown), the defense suggested that appellant may not have had a razor since no one knew what happened to the razor and no report apparently was made about the incident involving the razor. The trial court later permitted the State to call the court reporter before the jury and read back the portion of the court reporter's record where appellant admitted outside the jury's presence that he had the razor. Appellant objected that this evidence was inadmissible because appellant had not been Mirandized before making this admission.

> [DEFENSE]: We would like to renew our objection to the Court's ruling allowing counsel to introduce evidence of the outbursts of the defendant in the courtroom yesterday. And the basis of our objection is simply this.
>
> The defendant was authorized by the Court to speak to the Court. At that point, I believe that the Court was obligated to warn–to Mirandize him prior to allowing him to make any statement, because the Court's authorization, in our opinion, amounts to State action.
>
> The Court authorized him to speak freely without telling him what he said could be used against him in this proceeding, and without that–without that warning, the statement should be inadmissible into evidence.

[THE COURT]: Yes.

[STATE]: The record will reflect the defendant told the Court he had something to say. He was not being called as a witness by either side. Whereby it would have to be determined that he was making a freely, intelligently, knowingly, and voluntarily waiver of his rights. This was his statement to the Court. "I have something to say."

The Court, even in fact, said, "Wait a minute. Sit down." He persisted in wanting to make that statement. This was not someone–he was not being called by the Court or called by the defense or called by the State. This was his own statement, voluntarily.

[THE COURT]: The Court overrules the objection.

[DEFENSE]: If I may, Judge, I would just like to note the record reflects that the Court clearly states to the defendant, "Now, what is it you want to say to the Court?"

[THE COURT]: I understand. The Court overrules your objection.

The Supreme Court's decision in *Miranda* requires the exclusion of a defendant's statements made during "custodial interrogation" unless, prior to giving these statements, the defendant is "warned" that he has certain rights and he validly waives those rights. *See Miranda*, 384 U.S. at 478-79. Assuming that appellant was in "custody" for purposes of *Miranda*,[31] we do not believe that appellant's admission of possessing the razor made in the noncoercive atmosphere of open court with his lawyers present in an exchange with the trial court initiated by appellant can be considered the result of "interrogation" in any sense of how that term is described in *Miranda*. *See Miranda*, 384 U.S. at 444 (interrogation means "questioning initiated by law enforcement officers") and at 445 (salient features of "interrogation" are "incommunicado interrogation of individuals in a police-dominated atmosphere") and at 467 (expressing concern with inherently compelling pressures, which undermine a defendant's Fifth Amendment right against compelled self-incrimination, when the defendant is "thrust into an unfamiliar atmosphere and run through menacing police interrogation

---

[31] *See generally Herrera v. State*, 241 S.W.3d 520 (Tex.Cr.App. 2007).

procedures"); *see also Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) ("interrogation" is any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response). Point of error two is overruled.

In point of error five, appellant asserts that, during its punishment-phase jury arguments, the "State purposefully attacked appellant over the shoulders of Defense Counsel and subjected appellant to epitaphs unworthy of courtroom decorum and in violation of the United States Constitution." *See, e.g., Wilson v. State*, 938 S.W.2d 57, 59 (Tex.Cr.App. 1996) ("prosecutors' arguments which attack defense counsel are manifestly improper because they serve to inflame the minds of the jury to the accused's prejudice"); *Cockrell v. State*, 933 S.W.2d 73, 88 (Tex.Cr.App. 1996) (prosecutors cannot make improper personal attacks on defense lawyers during closing jury arguments). In his brief, appellant asserts:

> During closing arguments, the both (sic) trial prosecutors expanded their commentary to matters outside of the evidence and invoked images of horror and community concern far beyond the appropriate role of permissible final argument. (R.R. Vol. 61)72). (Sic). The defense objected and although the jury received an instruction to disregard, the defense motion for mistrial was denied.

The portion of the record apparently cited by appellant (V. 61, p. 72 of the reporter's record) is, however, a reference to closing jury arguments by the defense, not the State.[32] The only prosecutorial punishment-phase jury arguments that we have found for which the trial court denied a defense mistrial motion after sustaining a defense objection and instructing the jury to disregard were prosecutorial arguments referring to one of appellant's mitigation experts (Kate Allen).

---

[32]

The State argues that point of error five should be overruled "because neither this Court, nor the State, are charged with the duty to locate where in the voluminous record of this case the prosecutors made multiple improperly expanded comments to which Appellant properly objected and received rulings from the trial court."

[STATE]: Don't you fall for that. Who is [Kate Allen] to come in here and tell you what lessens his blameworthiness for what he did and that he deserves a life sentence? My God.

I sure hope our justice system has not reached the point where a child grows up in a poor household with a mom who's not perfect and chooses to start drugs and chooses to drop out because he said what? He had better things to do.

I hope that we haven't reached the point that all of those things combined lessen a person's blameworthiness for the crime he chose to commit.

I'll tell you this: I grew up in a really poor household, and not one time have I wanted to take the life of a 93-year-old woman.

And I'll tell you this: [the other prosecutor] lost a parent at an early age. I can assure you he's never wanted to take the life of a 93-year-old woman.

The other part of our team, [a named person], sits right out there. That's our legal assistant. She didn't have a perfect family situation. She's in the car when her mom runs over her dad.

[DEFENSE]: Judge, we're going to object to this. All of this is improper argument.

[THE COURT]: The Court sustains the objection as to the last portion of the argument.

[DEFENSE]: We'd ask the jury be instructed to disregard.

[THE COURT]: The jury will be instructed to disregard any closing arguments outside the record.

[DEFENSE]: Because of the prejudicial nature of the statements made, we'd respectfully move the Court for a mistrial.

[THE COURT]: Motion's denied.

You may proceed with closing arguments.

[STATE]: Thank you, Judge.

You think those things lessen a person's blameworthiness for what he did? When the defense talks to you about mitigation, and they will, you question it in your mind. You deserve to know. You ask yourself, how is that connected to killing [the victim]?

You ask yourself, how does that lessen his blameworthiness? That's his responsibility. He killed her. And you ask yourself, how does coming from a poor family matter? You ask yourself that. And you ask yourself, what in the world does that have to do with anything? And the answer is nothing.

We decide that these arguments did not strike at appellant over defense counsel's shoulders or "invoke[] images of horror and community concern far beyond the appropriate role of permissible final argument." Most of these arguments conveyed to the jury that appellant's "troubled upbringing" did not lessen his moral blameworthiness for the crime that he committed. *See Hawkins v. State*, 135 S.W.3d 72, 85-87 (Tex.Cr.App. 2004) (Womack, J., concurring) (discussing permissible areas of jury argument). Any preserved error in these arguments, such as the outside-the-record references to the life circumstances and upbringing of the members of the prosecutorial team, was cured by the trial court's instruction to disregard. *See Cruz v. State*, 225 S.W.3d 546, 548 (Tex.Cr.App. 2007) (mistrial motion should be granted when harm caused by objectionable argument cannot be cured by instruction to disregard); *Young v. State*, 137 S.W.3d 65, 69 (Tex.Cr.App. 2004) (grant of mistrial motion should be reserved for those cases in which an objection could not have prevented, and an instruction to disregard could not have cured, the prejudice stemming from an event at trial). Point of error five is overruled.

In point of error four, appellant claims that the "jury finding in regard to the [future-dangerousness] special issue, during the punishment phase of trial, was not supported by legally or factually sufficient evidence." We do not apply a factual-sufficiency review to the jury's answer to the future-dangerousness special issue. *See McGinn v. State*, 961 S.W.2d 161, 169 (Tex.Cr.App. 1998). In applying a legal-sufficiency review to the jury's answer to this special issue, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found beyond a reasonable doubt that there is a probability that the defendant would

constitute a continuing threat to prison or free society. *See Druery v. State*, 225 S.W.3d 491, 506-07 (Tex.Cr.App.), *cert. denied*, 128 S.Ct. 627 (2007); *Russeau v. State*, 171 S.W.3d 871, 878 (Tex.Cr.App. 2005), *cert. denied*, 548 U.S. 926 (2006). Appellant argues that the jury's answer to the future-dangerousness special issue is irrational because the evidence shows that this capital murder offense was an "aberrant act" from his history of "benign property crimes such as auto theft, or personal use of marijuana."

We disagree. The evidence shows that appellant broke into the home of and viciously attacked and murdered a 93-year-old woman, whom he beat, strangled, and stabbed before setting her body on fire and stealing her car. The State presented evidence from which a jury could reasonably find that the motive for this crime was appellant's desire to obtain money to buy crack cocaine. Before committing this crime, appellant had a criminal history for what he characterizes as "benign property crimes." Appellant attempted to put the blame for this death-penalty offense on an innocent acquaintance. Appellant misbehaved in the county jail during his incarceration there for this offense. This included altercations with jail staff and other inmates and possession of a razor and a jail trustee's jacket.[33] Appellant misbehaved in court during the trial of this offense, as discussed in point of error two. The State presented the testimony of two psychological experts, both of whom testified that appellant is dangerous. We decide that the evidence is legally sufficient to support the jury's answer to the future-dangerousness special issue. *See Holberg v. State*, 38 S.W.3d 137, 139 (Tex.Cr.App. 2000) (jury's answer to future-dangerousness special issue supported by legally sufficient evidence showing that drug-addict defendant brutally murdered the elderly victim

---

[33] The State suggested that appellant may have wanted a trustee's jacket to use in an escape attempt.

in order to obtain money to support a drug habit that defendant had attacked an elderly person before to obtain money to support a drug habit, that defendant misbehaved in jail by trying to have a witness killed, that defendant had a prior theft conviction, and that a State psychiatrist considered the defendant to be dangerous). A jury could reasonably reject the claim that appellant's commission of this capital offense was merely a temporary departure from appellant's usual "benign" crimes and find "that appellant exhibited a dangerous aberration of character and was essentially incorrigible." *See id*. Point of error four is overruled.

In point of error six, appellant claims that the "trial court erred in refusing to allow the defense to present testimony from appellant's family about the impact his execution would have on the family, in violation of appellant's Eighth Amendment and due process rights." In point of error seven, appellant claims that the "trial court erred in failing to include instruction allowing the jurors to consider any residual doubt as a mitigating circumstance when answering the mitigation special issue and the continuing threat special issue, depriving appellant of his right to lace (sic) all mitigating evidence, including the 'circumstances of the offense' within the jury's effective reach in violation of the Eighth and Fourteenth Amendments to the United States Constitution." We have previously rejected these claims. *See Gallo*, 239 S.W.3d at 779 (there is no constitutional right to residual-doubt jury instruction); *Roberts v. State*, 220 S.W.3d 521, 532 (Tex.Cr.App.), *cert. denied*, 128 S.Ct. 282 (2007) (trial court does not abuse its discretion to exclude execution-impact testimony). Points of error six and seven are overruled.

The judgment of the trial court is affirmed.

Hervey, J.

Delivered: November 26, 2008
Publish