# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### ON MOTION FOR REHEARING

### NO. 03-10-00759-CR

**Stephen Walker, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT
### NO. D-1-DC-10-300501, HONORABLE MICHAEL LYNCH, JUDGE PRESIDING

### M E M O R A N D U M   O P I N I O N

The State charged Stephen Walker with sexual assault of a child, indecency with a child by contact, and indecency with a child by exposure. *See* Tex. Penal Code Ann. §§ 21.11, 22.011(a)(2) (West 2011). Following the trial court's denial of Walker's motion to suppress, Walker pleaded guilty to the first-degree felony of sexual assault of a child he was prohibited from marrying. *See id.* § 22.011(f) (West 2011); § 25.01 (West Supp. 2011). Pursuant to a plea agreement, the court sentenced Walker to five years' imprisonment. On appeal, Walker argues that the trial court erred in refusing to suppress an oral confession he made before receiving his *Miranda* warnings.[1] Because we hold that Walker was not in custody at the time he made the confession, we affirm the judgment of conviction.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 477–79 (1966).

## BACKGROUND

Sabrina Nichols, a detective with the Child Abuse Unit of the Austin Police Department (APD), was notified that Walker's teenage daughter, S.W., had made an outcry of sexual abuse against him.[2] Detective Nichols then interviewed S.W., who reported that Walker had raped her five times. After that interview, Nichols called Walker and informed him that his name came up in an investigation involving a child. She asked Walker to come to the police station and talk with her about the matter, assuring him that he would not be arrested when he did. Walker agreed to come to the station for an interview.

When Walker arrived at the station, he was accompanied by his girlfriend and their infant son. Nichols led Walker to an interview room to speak with him alone. Walker was frisked by a police officer but was not handcuffed. Nichols informed Walker that he was not under arrest and could leave at any time, pointed out where the restrooms and water fountain were, and stated that although the door to the room was closed, it was not locked. Nichols proceeded to question Walker about the allegations against him. During this initial interview, which was captured by audio and video recorders, Walker denied any sexual activity with his daughter.

Eventually, Walker decided to leave the station. The audio and video recording ceased, and Nichols accompanied Walker to the lobby area, explaining that she had to escort him because they were in a secure building. Before going down the stairs, Walker stated repeatedly that he wanted to hug and kiss his son. Nichols responded that Walker was not under arrest, was free to

---

[2] The facts recited herein are taken from the testimony and exhibits presented at the pretrial hearing on Walker's motion to suppress evidence.

2

go downstairs to his son, and should call her in the future if he wished to take a polygraph test. Suddenly, Walker hurried into a nearby break room, where he hunched down and began to cry. Nichols followed Walker into the room, where he told Nichols he wanted to talk to her some more and to tell her something in front of his girlfriend. At some point during this exchange, Walker also stated that he wanted to kill himself.

Nichols led Walker back to the interview room and then brought in his girlfriend and son. In front of Nichols, Walker told his girlfriend that S.W. had begun wearing "hoochie clothes." He said S.W. asked him for a massage on one occasion, but it did not go too far. Feeling that Walker wanted to continue his confession without his girlfriend present, Nichols had a detective walk the girlfriend back downstairs. Around this time, a new audio and video recording of the interview began.

Nichols repeated that Walker was free to leave at any time and that the door was closed, but not locked. Nichols and Walker then began discussing his daughter's allegations again, and Walker eventually recalled a night when S.W. asked for a massage for her back pain from scoliosis. Walker said that as he massaged S.W., she began asking him to rub lower and lower on her back, until he was almost touching her buttocks. Walker said he could tell that S.W. wanted him to have sex with her. As the interview continued, Walker cried and stated that he wanted to go home. Nichols reminded Walker that he could leave any time he wanted. Walker then said Nichols just wanted to lock him up, and she replied that regardless of what Walker told her, he would be leaving with his family that evening. Ultimately, Walker admitted that his massage of S.W. ended in sexual activity. Walker confessed that he put his finger inside his daughter's vagina one time.

Nichols continued interviewing Walker for approximately another hour. She mentioned again that Walker could leave at any time, to which he replied, "I know." Nichols then asked Walker

about the statement he made earlier about killing himself. Walker elaborated, stating that he had been thinking about suicide for a long time. At that point, Nichols stepped out of the room to ask for a mental health officer to speak with Walker. When the officer arrived, Nichols explained to Walker that the officer was there because Walker had mentioned needing help.

The mental health officer evaluated Walker on tape in the interview room. Eventually, the officer informed Walker that they were going to St. David's Hospital for further evaluation and that Walker would ride in the back of a patrol car. Nichols assured Walker that he was not under arrest, and when Walker asked when he would be able to go home, Nichols reminded him that he had asked for help earlier and told him they were giving him that help. An officer drove Walker to the hospital and left him there for the evaluation. While Walker remained at St. David's for two to three hours, Nichols obtained a warrant for his arrest. The officer who had dropped Walker off returned to the hospital and, after Walker was medically cleared, arrested him for sexual assault of a child.

Walker was subsequently indicted for three counts of sexual assault of a child, one count of indecency with a child by contact, and two counts of indecency with a child by exposure. *See id.* §§ 21.11, 22.011(a)(2). He filed a motion to suppress his confession, and on May 24, 2010, the trial court held a pretrial hearing on the motion. Detective Nichols testified regarding her questioning of Walker, and the audio and video recordings of both phases of their interview were admitted into evidence; Walker did not testify at the hearing. After the hearing, the court issued an order stating that Walker's motion did not inform the court of any specific complaint regarding the interview, and unless Walker filed a more detailed motion within ten days, his motion would be denied.

4

Walker did not amend his motion but instead, on October 28, 2010, accepted a plea bargain. In exchange for pleading guilty to one count of sexual assault of a child he was prohibited from marrying, a first-degree felony, Walker received five years of imprisonment. Having retained the right to appeal with regard to the subject of his pretrial motion, Walker now appeals. He complains that the trial court should have suppressed his confession because it was the product of a custodial interrogation conducted without the prior warnings required under *Miranda v. Arizona* and Texas Code of Criminal Procedure Article 38.22. *See* Tex. Code Crim. Proc. Ann. art. 38.22 (West 2005); *Miranda v. Arizona*, 384 U.S. 436, 477–79 (1966).

## STANDARD OF REVIEW

The appropriate standard of review for a suppression ruling is a bifurcated review, giving almost total deference to the trial court's findings of fact, but conducting a de novo review of its application of law to those facts. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002); *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

A trial court's ultimate custody determination presents a mixed question of law and fact. *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007). We therefore "afford almost total deference to a trial judge's 'custody' determination when the questions of historical fact turn on credibility and demeanor." *Id.* at 526–27. "Conversely, when the questions of historical fact do not turn on credibility and demeanor, we will review a trial judge's 'custody' determination de novo." *Id.* at 527.

5

**DISCUSSION**

In Walker's sole issue on appeal, he argues that the trial court erred in refusing to suppress his confession because it was the product of a custodial interrogation and he was not read his *Miranda* rights before it was made. The Supreme Court's decision in *Miranda* requires a defendant's statements made during a "custodial interrogation" to be suppressed if the defendant was not warned of certain rights prior to giving the statements. *See Williams v. State*, 270 S.W.3d 112, 136 (Tex. Crim. App. 2008); *see also* Tex. Code Crim. Proc. Ann. art. 38.22. Here, it is undisputed that Walker was interrogated by Detective Nichols and was not read his *Miranda* rights before confessing to a sexual act with his daughter. Therefore, if Walker was in custody when his confession was made, the confession would be inadmissible and should have been suppressed.

"A person is in 'custody' only if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest." *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996). In addition, "the mere fact that an interrogation begins as noncustodial does not prevent custody from arising later; police conduct during the encounter may cause a consensual inquiry to escalate into custodial interrogation." *Id.* at 255. The court of criminal appeals has outlined at least four general situations that may constitute custody: "(1) when the suspect is physically deprived of his freedom in any significant way, (2) when a law enforcement officer tells the suspect that he cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect he is free to leave." *Id.* Ultimately, the determination of custody

6

must be made on an ad hoc basis, after considering all of the objective circumstances. *Herrera*, 241 S.W.3d at 535.

Walker acknowledges that he was not in custody at the outset of his interview with Nichols. However, he asserts three reasons why a custodial interrogation subsequently developed and he therefore should have received his *Miranda* warnings before making his confession concerning the sexual act with his daughter. First, Walker argues that after he made comments to the police that he was suicidal, he was no longer free to leave. Second, Walker claims that his interview became custodial because, after his daughter's outcry and even more so after his own statements about giving her a massage, there was probable cause to arrest him. Third, he argues that the general circumstances surrounding the interview, such as the fact that he was frisked, escorted by police, and questioned for several hours, would lead a reasonable person to believe his freedom was restricted to a significant degree.

We first address Walker's argument that, after he mentioned suicide, the police created a situation in which a reasonable person would have believed his freedom was significantly restricted. Throughout the course of the interview, Detective Nichols assured Walker that he was not under arrest and was free to leave. These assurances continued even after Walker mentioned his suicidal thoughts.[3] Thus, there is no evidence in the record that would lead a reasonable person to believe his freedom was significantly restricted as a result of having made suicidal comments.

---

[3] Nichols did not begin to question Walker about his statement that he wanted to kill himself until after he confessed to touching his daughter's vagina. Likewise, the mental health officer did not arrive until after Walker's confession, and Walker was not told that he was being taken to the hospital until after he made the incriminating statements.

7

Walker stresses that he was no longer free to leave the station because it is APD's policy to transfer suicidal individuals to a hospital for evaluation and he triggered this policy upon mentioning suicide. However, the existence of the APD policy alone is not dispositive of whether Walker was in custody. *See Stansbury v. California*, 511 U.S. 318, 321, 323–25 (1994) (per curiam); *Dowthitt*, 931 S.W.2d at 254. While Nichols testified at the suppression hearing that APD had such a policy, there is no evidence that the policy was ever communicated to Walker.[4] The situation created by the police is not defined by what they subjectively believed about Walker's freedom, but what was objectively manifested and what a reasonable person would believe as a result. *See Stansbury*, 511 U.S. at 323–25. In this case, because the police never told Walker he could no longer leave after mentioning his suicidal thoughts, but instead continued to assure him that he would be free to leave, the noncustodial nature of the interview did not change.

We next address Walker's argument that the existence of probable cause was a factor in the development of custody in his case. The court of criminal appeals has declared that probable cause to arrest is a factor in custody determinations and that custody may arise when probable cause exists and law enforcement officers do not tell the suspect that he is free to leave. *Dowthitt*, 931 S.W.2d at 254–55 (citing *Shiflet v. State*, 732 S.W.2d 622, 629 (Tex. Crim. App. 1985)). Nevertheless, "this situation does not automatically establish custody; rather, custody is established if the manifestation of probable cause, combined with other circumstances, would lead a reasonable

---

[4] Further, there is no evidence that the policy did not permit individuals to decline the evaluation, that Walker ever attempted to decline the hospital evaluation, or that the officers ever stated that he could not. The evidence therefore fails to establish that Walker was no longer free to leave according to the policy.

8

person to believe that he is under restraint to the degree associated with an arrest." *Id.* at 255. Here, Nichols repeatedly informed Walker that he was free to leave. In fact, she said this to Walker not only after his daughter's outcry, but after his statement about giving her a massage, and even after his confession to inserting his finger in her vagina. While probable cause is a factor in determining custody, its existence during Walker's interview is not dispositive of whether he was in custody, because he was constantly told he could leave. *See id.* at 254–55.

Finally, we address Walker's argument about the time and circumstances surrounding his interview. Walker stresses that the interview lasted several hours, that it took place at the police station, and that he was frisked and escorted while there. However, these aspects of the interview do not outweigh Nichols's explicit statements and actions. As previously discussed, Nichols repeatedly stated to Walker that he was not under arrest and could leave at any time. She made these statements not only before Walker's first comment about suicide, but multiple times afterward, including after his confession. Also subsequent to Walker's first suicidal comment, Nichols reminded him that the door was not locked. When she escorted Walker through the station, she explained that she was doing so because they were in a secure building. Finally, although no one repeated that Walker was free to leave after the mental health officer arrived, no one stated that he was required to stay.

Moreover, nothing in the audio and video recording of the interview indicates that Nichols's actions or the physical environment contradicted these oral statements to Walker. He was not handcuffed or required to change his clothing for the interview. At Walker's request, his girlfriend was permitted to join him in the interview room for a few minutes. Most significantly, according

9

to Nichols's uncontroverted testimony, she allowed Walker to end the interview and walk almost all the way to the lobby before he voluntarily turned back and asked to resume talking to her.[5]

Viewing the evidence in the light most favorable to the trial court's ruling, we hold that the circumstances were not such that a reasonable person would believe he was restrained to the degree associated with a formal arrest at the time Walker confessed. The trial court therefore did not err in denying Walker's motion to suppress on the basis that *Miranda* warnings were not required.

## CONCLUSION

Because Walker was not in custody, his confession was not taken in violation of the code of criminal procedure and *Miranda v. Arizona*, and the trial court did not err in denying his motion to suppress. We affirm the judgment of conviction.

_____

Diane M. Henson, Justice

Before Justices Puryear, Henson, and Goodwin

Affirmed on Motion for Rehearing

Filed: April 6, 2012

Do Not Publish

_____

[5] Although Walker was arrested later that day—despite Nichols's assurances that he would not be arrested at the station and would go home with his family that night—that fact does not retroactively change how a reasonable person would perceive the circumstances leading up to his confession. *See Brown v. State*, 475 S.W.2d 938, 951 (Tex. Crim. App. 1971) ("The fact that an individual was arrested several hours after the interview . . . would not transform the interview into one classified as custodial."), *overruled on other grounds by Bradford v. State*, 608 S.W.2d 918 (Tex. Crim. App. 1980).

10